Receipt number 9998-5120937

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| NORIDIAN MUTUAL INSURANCE COMPANY, D/B/A BLUE CROSS BLUE SHIELD OF NORTH DAKOTA, | ) ) ) ) ) | |
| Plaintiff, | ) ) | No. 18-1983 C |
| v. | ) ) | |
| THE UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) ) ) | |

**COMPLAINT**

Plaintiff Noridian Mutual Insurance Company, doing business as Blue Cross Blue Shield of North Dakota ("Plaintiff" or "BCBSND"), by and through its undersigned counsel, files this Complaint against Defendant, the United States of America ("Defendant," "United States," or "Government"), and alleges the following:

**INTRODUCTION**

1.      This action seeks money damages for Defendant's breach of its statutory, regulatory, contractual, and/or Constitutional obligations to make full and timely cost-sharing reduction ("CSR") payments to BCBSND, as prescribed by Sections 1402 and 1412 of the Patient Protection and Affordable Care Act ("ACA").  The Government had made such monthly advance CSR payments to BCBSND for 45 consecutive months from January 2014 until October 12, 2017, when the Government announced it would stop making such mandatory CSR payments to BCBSND and other similarly situated qualified health plan issuers ("QHPs") that had been voluntarily participating on the ACA Exchanges.

- 1 -

2.      As detailed below, Congress intended and mandated in Section 1402 of the ACA

that Defendant "shall make periodic and timely [CSR] payments" to QHPs as full reimbursement

for the QHPs providing mandatory CSR discounts to certain of their middle- and low-income

ACA customers.  Congress designed those CSR discounts as a federally funded subsidy to

reduce eligible customers' out-of-pocket costs for health care.

3.      In Section 1412 of the ACA, Congress expressly required Defendant to make the

advance CSR payments to QHPs, such as BCBSND, in advance of when those QHPs would

provide the CSR discounts to their eligible customers, to minimize the financial burden on those

QHPs while they served as the Government's conduit for delivering the federal CSR subsidies to

eligible enrollees.

4.      Defendant has failed to honor its mandatory advance CSR payment obligation to

BCBSND, but BCBSND remains financially obligated under Section 1402 to continue to

provide CSR discounts to its eligible customers.  Defendant unlawfully has shifted the financial

burden entirely upon BCBSND, thwarting Congress's design, intent, and express mandate

regarding the CSR program and CSR reimbursements.

5.      This action seeks monetary damages from Defendant of at least $9,573,460.11,

the total amount of mandatory advance CSR payments the Government currently owes

BCBSND, but unlawfully has refused to pay.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action and venue is proper in this Court

pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1), because Plaintiff brings claims for monetary

damages over $10,000 against the United States based on the Government's violations of money-

mandating Acts of Congress, money-mandating regulations of an executive department, implied-

in-fact contracts with the United States, and takings of Plaintiff's property in violation of the Fifth Amendment of the Constitution.

7.      The actions and/or decisions of the Department of Health and Human Services ("HHS"), the Centers for Medicare & Medicaid Services ("CMS"), and the Department of the Treasury ("Treasury") at issue in this lawsuit were conducted on behalf of the Defendant United States within the District of Columbia.

## PARTIES

8.      Plaintiff NORIDIAN MUTUAL INSURANCE COMPANY, doing business as Blue Cross Blue Shield of North Dakota ("BCBSND"), is a not-for-profit mutual company located in Fargo, North Dakota, and is the largest provider of health care coverage in North Dakota.  BCBSND has been a QHP issuer on the North Dakota Health Insurance Marketplace each calendar year since CY 2014.

9.      Defendant is THE UNITED STATES OF AMERICA.  HHS, CMS, and Treasury are agencies of the Defendant United States of America.

## FACTUAL ALLEGATIONS

### Congress Enacts the Patient Protection and Affordable Care Act

10.      Congress's enactment in 2010 of the ACA, Public Law 111-148, 124 Stat. 119, marked a historic shift in the United States health care market.

11.      Through the ACA, Congress aimed to increase the number of Americans covered by health insurance and decrease the cost of health care in the U.S., and included a series of interlocking reforms designed to expand coverage in the individual health insurance market.  The market reforms guaranteed availability of health care to all Americans, and prohibited health

insurers from using factors such as health status, medical history, preexisting conditions, gender, and industry of employment to set premium rates or deny coverage.

12.     The ACA provides that "each health insurance issuer that offers health insurance coverage in the individual . . . market in a State must accept every . . . individual in the State that applies for such coverage." 42 U.S.C. § 300gg–1(a).  The ACA also generally bars insurers from charging higher premiums on the basis of a person's health.  *See* 42 U.S.C. § 300gg.

13.     Through the ACA, Congress created competitive statewide health insurance marketplaces – the ACA Exchanges – that offer health insurance options to consumers.  Section 1311 of the ACA establishes the framework for the Exchanges.  *See* 42 U.S.C. § 18031.

14.     BCBSND voluntarily participated as a QHP on the federally-facilitated ACA Exchange in North Dakota, after complying with the certification requirements of the Government and/or the state-level operator of the North Dakota ACA Exchange, from January 1, 2014 (the first day of the ACA Exchanges) through the present.  For each calendar year in which Plaintiff has participated on the ACA Exchange, its premiums were submitted to and approved by the North Dakota insurance regulator in the spring and/or summer of the previous year (*e.g.*, spring and/or summer of 2013 for CY 2014).

15.     Upon the Government's and/or the state-level operator's evaluation and certification of Plaintiff as a QHP, BCBSND was required to provide a package of "essential health benefits" on the ACA Exchange on which it voluntarily participated.  42 U.S.C. § 18021(a)(1).

16.     In deciding to become and continue as a QHP in North Dakota each calendar year, BCBSND understood and believed that, in exchange for complying with numerous obligations imposed on QHPs, the Government would comply with many reciprocal obligations

imposed on it – including among others, the obligation to make full and timely advance CSR payments to eligible QHPs, like BCBSND.  The Government, however, unlawfully has failed to do so, as detailed below.

## The ACA's Cost-Sharing Reduction Program

17.     To make health insurance more affordable for low-and modest-income Americans, the ACA provides for funding from the Government to eligible enrollees.  Those federal subsidies help offset the two kinds of costs that consumers must pay to obtain health insurance:  (i) health insurance premiums, and (ii) out-of-pocket expenses for health care (such as deductibles, co-pays, co-insurance, the annual limitation on cost-sharing, and similar expenses).  The latter are known as "cost-sharing" expenses, and are directly related to the former under the ACA.

18.     Regarding health insurance premiums, Section 1401 of the ACA amended the Internal Revenue Code by providing "premium tax credits" from the Government that reduce monthly health insurance premiums on ACA Exchange plans for individuals who earn between 100% and 400% of the federal poverty level, and who satisfy additional criteria.  *See* 26 U.S.C. § 36B (ACA § 1401).

19.     Regarding cost-sharing expenses, Section 1402 of the ACA mandates that, after being notified by HHS that a customer is eligible for CSR discounts, a QHP "shall reduce" a specified portion of that customer's out-of-pocket health care costs for "deductibles, copayments, or similar charges." 42 U.S.C. § 18071(a)(2); § 18022(c)(3)(A).

20.     Congress intended CSR discounts to be available to enrollees who meet three criteria:  (i) they are eligible to receive premium tax credits under Section 1401, (ii) their household income is less than 250% of the federal poverty level—in 2017, under $61,500 for a

family of four—and (iii) they are enrolled in a "silver" plan offered by the QHP in an ACA

Exchange's individual market.  42 U.S.C. § 18071(b), (c)(2), (f)(2); *Annual Update of the HHS*

*Poverty Guidelines*, 82 FR 8831, 8832 (Jan. 31, 2017), attached hereto at <u>Exhibit 01</u>; CMS,

*Manual for Reconciliation of the Cost-Sharing Reduction Component of Advance Payments for*

*Benefit Year 2016* at 6 (Dec. 27, 2016), attached hereto at <u>Exhibit 02</u> (hereinafter, "CMS 2016

CSR Manual").  Section 1402(d) further provides special rules for QHPs that provide CSR

discounts to American Indians and Alaska Natives.  *See* 42 U.S.C. § 18071(d).

21.     QHPs, like BCBSND, that are certified to voluntarily participate in an ACA

Exchange must offer at least one "silver" health plan.  *See* 42 U.S.C. § 18071(c)(2).  Before

applying CSR discounts, a "silver" plan is structured so that the QHP pays an estimated 70

percent of an enrollee's health care costs, leaving the enrollee responsible for a 30 percent share

of their health care costs.  *See* 42 U.S.C. § 18022(d)(1)(B).  Congress intended for CSR

discounts subsidized by the Government to further reduce eligible enrollees' health care costs,

but not to increase costs for QHPs.

22.     Of the approximately 10.3 million people enrolled through the ACA Exchanges in

CY 2017, nearly 5.9 million (about 57%) received CSR discounts. *See* CMS, *2017 Effectuated*

*Enrollment Snapshot* (June 12, 2017), attached hereto at <u>Exhibit 03</u>.

23.     Although Congress's design called for eligible enrollees to receive CSR discounts

directly from their health insurance QHPs, like BCBSND, Congress did not intend for QHPs to

bear the expense of the CSR discounts.  Instead, Congress intended and mandated in Sections

1402 and 1412 of the ACA that the Government "shall" fully reimburse QHPs – and do so in

advance – for those CSR discounts through advance CSR payments from the Government to

QHPs.

24.     In Section 1402, Congress authorized and expressly required that the Government "*shall* make periodic and timely [CSR] payments" directly to QHPs, in an amount "*equal to* the value of the" CSR discounts, to reimburse QHPs for the CSR discounts that QHPs are statutorily required to make to eligible customers.  42 U.S.C. § 18071(c)(3)(A) (emphasis added).

25.     Additionally, in Section 1412, Congress mandated HHS and Treasury to coordinate in providing CSR payments to QHPs in advance of the QHPs' provision of CSR discounts to eligible customers.  *See* 42 U.S.C. § 18082(c)(3) ("Treasury *shall* make such advance [CSR] payment [to QHPs] at such time and in such amount as the [HHS] Secretary specifies ….") (emphasis added).

26.     Congress purposefully used the word "*shall*" in Sections 1402 and 1412 to clearly indicate that advance CSR payments are a money-mandating obligation of the United States that the Government must make to QHPs, like BCBSND.  Advance CSR payments are not subsidies for QHPs, they are mandatory advance payments owed by the Government to reimburse QHPs for the mandatory CSR discounts the ACA requires QHPs to provide to eligible customers for their out-of-pocket health care expenses.

27.     Congress did not limit in any way the Government's obligation to make full advance CSR payments owed to QHPs, due to appropriations, restriction on the use of funds, or otherwise in Section 1402, Section 1412, or anywhere else in the ACA.  The Government's obligation to make full advance CSR payments to QHPs is not, and has never been, subject to "budget neutrality."

28.     Congress has not amended or repealed Section 1402 or Section 1412 since enactment of the ACA, and Congress has never taken any legislative action regarding the Government's obligation to make advance CSR payments to QHPs.

- 7 -

29.     The Government thus lacks statutory authority to pay anything less than 100% of the advance CSR payments due to BCBSND.

30.     Based on the language of Sections 1402 and 1412 and their implementing regulations, and the representations and conduct of the Government since the CSR program was initiated, when it agreed to commit each year to the ACA Exchanges, BCBSND understood that it would not bear the expense of the mandatory CSR discounts the ACA required it provide to eligible enrollees. Instead, BCBSND understood that the Government would pay BCBSND in advance for those CSR discounts through "periodic and timely" advance monthly CSR payments.

31.     The Government has failed to honor its mandatory advance CSR payment obligation to BCBSND since October 12, 2017.

### HHS's Cost-Sharing Reduction Regulations

32.     The HHS Secretary formally delegated authority over the CSR program under Section 1402 and Section 1412 to the CMS Administrator on August 30, 2011, specifically directing that "CMS will consult with the Department of the Treasury."  *See* 76 FR 53903, 53903-04 (Aug. 30, 2011), attached hereto at Exhibit 04.  By authority of this delegation from the HHS Secretary, CMS issued implementing regulations for the CSR program at 45 C.F.R. Part 156.

33.     The process for providing advance CSR payments and later reconciling those payments against CSR discounts is set forth at 45 C.F.R. § 156.430.  *See* 45 C.F.R. § 156.430; CMS 2016 CSR Manual at 6 n.9, Ex. 02.

34.     The CSR payment regulations state that QHPs "*will* receive periodic ***advance***

payments based on the advance payment amounts calculated in accordance" with a regulatory

formula.  45 C.F.R. § 156.430(b)(1) (emphasis added).

35.     HHS and CMS determined that the Government would make "periodic" advance

CSR payments monthly, and then in fact the Government made advance CSR payments to QHPs

each month from January 2014 until October 2017 – a total of 45 consecutive monthly advance

CSR payments.  As HHS explained when it first decided to make monthly CSR payments:

> We proposed to implement a payment approach under which we would
> make ***monthly*** advance payments to issuers to cover projected cost-
> sharing reduction amounts, and then reconcile those advance payments at
> the end of the benefit year to the actual cost-sharing reduction amounts.
> ***This approach fulfills the Secretary's obligation to make "periodic and
> timely payments equal to the value of the reductions" under section
> 1402(c)(3) of the Affordable Care Act.***  We expect that this approach
> would not require issuers to fund the value of any cost-sharing reductions
> prior to reimbursement.

78 FR 15409, 15486 (Mar. 11, 2013) (Final Rule) (emphasis added) (internal footnote omitted),

attached hereto at Exhibit 05.

36.     Under the implementing regulations, an annual CSR reconciliation process occurs

following the conclusion of each benefit year, with QHPs notifying the HHS Secretary of CSR

discounts provided on behalf of eligible enrollees for actual essential health services.  *See* 45

C.F.R. § 156.430(c); Bulletin, CMS, *Data submission deadline for cost-sharing reduction

reconciliation* (Apr. 15, 2016), attached hereto at Exhibit 06 (hereinafter, "CMS CSR Data

Submission Bulletin").

37.     HHS then analyzes the relevant data, and reconciles the amount of CSR discounts

that eligible customers received from a QHP in the previous benefit year against the advance

CSR payments that HHS made to the QHP for the same benefit year.  *See* 45 C.F.R. §

156.430(d); CMS CSR Data Submission Bulletin, Ex. 06.

38.     If a discrepancy exists between the previous benefit year's amount of CSR

discounts and advance CSR payments, the discrepancy is resolved through either an additional

reimbursement "for the difference" that HHS "will" provide to the QHP, or a repayment of "the

difference" that the QHP "must" provide to HHS.  45 C.F.R. § 156.430(e); CMS 2016 CSR

Manual at 36, Ex. 02.

39.     Through this CSR reconciliation and reimbursement process, HHS and QHPs

ensure that the advance CSR payments from the Government to a QHP in a benefit year equal

the actual amount of CSR discounts from the QHP to its eligible enrollees in that benefit year,

consistent with Congress's mandate to the Government in Section 1402.  *See* 42 U.S.C. §

18071(c)(3)(A) ("[T]he [HHS] Secretary shall make periodic and timely payments to the [QHP]

equal to the value of the [CSR discount] reductions.").

**Plaintiff is a QHP for CYs 2017 to 2019**

40.      BCBSND executed its first QHP Issuer Agreement with CMS in 2013 and has

participated in the North Dakota ACA Exchange each year since CY 2014.

41.     On September 23, 2016, BCBSND executed a QHP Issuer Agreement for 2017

with CMS that is effective from September 23, 2016 through December 31, 2017, attached

hereto at Exhibit 07, confirming its participation on the North Dakota ACA Exchange for CY

2017 (the "CY 2017 QHP Agreement").

42.     On September 26, 2017, BCBSND executed a QHP Issuer Agreement for 2018

with CMS that is effective from October 2, 2017 through December 31, 2018, attached hereto at

Exhibit 08, confirming its participation on the North Dakota ACA Exchange for CY 2018 (the "CY 2018 QHP Agreement").

43.     On September 18, 2018, BCBSND executed a QHP Issuer Agreement for 2019 with CMS that is effective from September 25, 2018 through December 31, 2019, attached hereto at Exhibit 09, confirming its participation on the North Dakota ACA Exchange for CY 2018 (the "CY 2019 QHP Agreement").

44.     Before BCBSND executed the CY 2017, CY 2018 and CY 2019 QHP Agreements, BCBSND executed several attestations certifying its compliance with the obligations it was undertaking by continuing to act as a QHP on the ACA Exchange in North Dakota.

45.     The federal Government's advance CSR payments that Congress mandated through the CSR program, and that the Government confirmed in the implementing regulations, was a significant factor in BCBSND's decision to agree to become a QHP and undertake the many responsibilities and obligations required for BCBSND to participate in the North Dakota ACA Exchange.

46.     Had BCBSND known that the Government would fail to fully and timely make the mandatory advance CSR payments owed to BCBSND, then BCBSND may not have agreed to provide CSR discounts to eligible members and BCBSND's annual premiums on the North Dakota Exchanges would necessarily have been higher than actually charged.  BCBSND also may not have agreed to participate in the ACA Marketplace without adequate pricing had it known that the Government would have breached its obligations regarding the CSR program.

### HHS's and CMS's Interpretation of
### <u>The Government's Cost-Sharing Reduction Payment Obligations</u>

47.     Starting in January 2014 and continuing uninterrupted until October 2017, the HHS and Treasury Secretaries – including those in the current Trump Administration – made the Government's monthly advance CSR payments to QHPs, including BCBSND, as Congress required in the ACA and consistent with their interpretation of the Government's money-mandating payment obligations under the ACA.  *See* CMS 2016 CSR Manual at 36, <u>Ex. 02</u> ("Payments to issuers for the cost-sharing reduction component of advance payments began in January 2014.").

48.     In rulemaking as early as 2012, HHS and CMS publicly wrote in the Federal Register that "if the actual amounts of [CSR discounts provided from QHPs to eligible enrollees] exceed the advance [CSR] payment amounts provided to the [QHP by HHS] …, ***HHS would reimburse the issuer for the shortfall***, assuming that the [QHP] has submitted its actual [CSR] amount report to HHS in a timely fashion."  77 FR 73118, 73176 (Dec. 7, 2012) (Proposed Rule) (emphasis added), attached hereto at <u>Exhibit 10</u>.

49.     BCBSND has always timely submitted its required CSR reports to HHS.

50.     In final rulemaking of March 11, 2013, while QHPs like BCBSND were contemplating whether to commit to participating in the ACA Exchanges, HHS and CMS announced their interpretation that "***cost-sharing reductions are reimbursed by the Federal government***."  78 FR 15409, 15481 (Mar. 11, 2013) (Final Rule) (emphasis added), <u>Ex. 05</u>.  In describing the CSR advance payment and reconciliation process, HHS and CMS expressly acknowledged "the [HHS] Secretary's ***obligation*** to make 'periodic and timely payments equal to the value of the reductions' under section 1402(c)(3) of the Affordable Care Act."  *Id.* at 15486 (emphasis added).  HHS and CMS expressed their understanding of the statutory

requirement that "*QHP issuers will be made whole* for the value of all cost-sharing reductions provided through the reconciliation process after the close of the benefit year." *Id.* at 15488 (emphasis added).  Finally, HHS and CMS expressed their interpretation that "*Section 1402(c)(3) provides for the Secretary of HHS to make payments to QHP issuers equal to the value of the cost-sharing reductions.*" *Id.* at 15489 (emphasis added).

51.     In final rulemaking of March 11, 2014, HHS and CMS stated their interpretation that:

> *Section 1402(c)(3)* of the Affordable Care Act directs a QHP issuer to notify the Secretary of cost-sharing reductions made under the statute, and *directs the Secretary to make periodic and timely payments to the QHP issuer equal to the value of those reductions.*  Section 1412(c)(3) of the Affordable Care Act permits advance payments of cost-sharing reduction amounts to QHP issuers based upon amounts specified by the Secretary. Under these authorities, we established a payment approach in the 2014 Payment Notice under which monthly advance payments made to issuers to cover projected cost-sharing reduction amounts are reconciled after the end of the benefit year to the actual cost-sharing reduction amounts.

79 FR 13743, 13805 (Mar. 11, 2014) (Final Rule) (emphasis added), attached hereto at Exhibit 11.

52.     In early 2015, in guidance issued to QHPs regarding the CSR reconciliation process, HHS and CMS stated that "[t]he [ACA] requires [QHPs] to provide cost-sharing reductions to eligible enrollees in such [silver] plans, *and provides for issuers to be reimbursed for the value of those cost-sharing reductions*" by the Government.  Bulletin, CMS, *Timing of Reconciliation of Cost-Sharing Reductions for the 2014 Benefit Year* at 1 (Feb. 13, 2015), attached hereto at Exhibit 12 (hereinafter, "CMS 2014 CSR Bulletin") (emphasis added).

53.     In a December 2016 manual regarding CSR reconciliation, HHS and CMS again acknowledged that under Sections 1402 and 1412 of the ACA, "periodic and timely payments

equal to the value of [QHPs' CSR] reductions ***are required to be made to issuers*** … in advance"
by the Government.  CMS 2016 CSR Manual at 6 & n.8 (emphasis added), Ex. 02.

54.     HHS and CMS implemented the CSR reconciliation process for both CY 2014
and CY 2015 in the middle of 2016, and BCBSND timely submitted its CSR data to CMS and
participated in the process.  *See* CMS 2014 CSR Bulletin at 1-2, Ex. 12; CMS CSR Data
Submission Bulletin, Ex. 06; CMS, *Manual for Reconciliation of the Cost-Sharing Reduction
Component of Advance Payments for Benefit Years 2014 and 2015* at 6 (Mar. 16, 2016), attached
hereto at Exhibit 13 (hereinafter, "CMS 2014-15 CSR Manual"); Email from Jeff Grant,
Director, Payment Policy and Financial Management Group, CMS, to Tony Piscione, Vice
President of Actuarial, Blue Cross Blue Shield of North Dakota (June 30, 2016) (regarding
Benefit Year 2014), attached hereto at Exhibit 14.

55.     These repeated public statements by HHS and CMS were made or ratified by
representatives of the Government who had actual authority to bind the United States, including,
but not limited to, the HHS Secretary and Kevin J. Counihan, the CMS official designated as the
Chief Executive Officer of the ACA Health Insurance Marketplaces and Director of CMS's
Center for Consumer Information and Insurance Oversight ("CCIIO"), which regulates health
insurance at the federal level.  *See* CMS Leadership, Center for Consumer Information and
Insurance Oversight, Kevin Counihan, https://www.cms.gov/About-
CMS/Leadership/cciio/Kevin-Counihan.html (last visited Jan. 12, 2017), attached hereto at
Exhibit 15 (Mr. Counihan's job description).  Mr. Counihan's successor was Randy Pate, who is
the current CMS Deputy Administrator and the Director of the Center for Consumer Information
and Insurance Oversight.  Mr. Pate "leads CMS' work on the individual and small group
markets, including the Health Insurance Exchanges."  CMS Leadership, Center for Consumer

Information and Insurance Oversight, Randy Pate, available at: https://www.cms.gov/About-CMS/Leadership/cciio/Randy-Pate.html.

56.     After the inauguration of President Donald J. Trump on January 20, 2017, HHS, CMS and Treasury continued to make the Government's monthly advance CSR payments to QHPs.

57.     In the middle of 2017, HHS and CMS implemented the CSR reconciliation process for CY 2016, and BCBSND timely submitted its CSR data to CMS and participated in the process. *See* CMS 2016 CSR Manual at 8-9 & 36, <u>Ex. 02</u>; Email from Jeffrey Grant, Director, Payment Policy and Financial Management Group, CMS, to Tony Piscione, Vice President of Actuarial, Blue Cross Blue Shield of North Dakota (June 30, 2017), attached hereto at <u>Exhibit 16</u>.

58.     The Government continued making monthly mandatory advance CSR payments to QHPs, including BCBSND, through September 2017 (for October 2017 CSR discounts) as required by the ACA and its implementing regulations, as well as by the Government's contracts with Plaintiff.

### **The Government Breaches its Cost-Sharing Reduction Payment Obligations**

59.     On October 12, 2017, the Trump Administration announced that the Government would no longer make CSR payments to QHPs.  In a press statement, the White House stated that:

> Based on guidance from the Department of Justice, the Department of Health and Human Services has concluded that there is no appropriation for cost-sharing reduction payments to insurance companies under [the ACA].  In light of this analysis, the Government cannot lawfully make the cost-sharing reduction payments.

Dan Mangan, *Obamacare bombshell: Trump kills key payments to health insurers*, CNBC, Oct.

12, 2017, attached hereto at <u>Exhibit 17</u>.

60.     HHS and CMS also issued a press release on October 12, 2017, stating:

> After a thorough legal review by HHS, Treasury, OMB, and an opinion from the Attorney General, we believe that ... Congress has not appropriated money for CSRs, and we will discontinue these payments immediately.

Press Release, HHS & CMS, *Trump Administration Takes Action to Abide by the Law and*

*Constitution, Discontinue CSR Payments* (Oct. 12, 2017), attached hereto at <u>Exhibit 18</u>.

61.     In making such statement, however, the Government ignored that "[i]t has long

been established that the mere failure of Congress to appropriate funds, without further words

modifying or repealing, expressly or by clear implication, the substantive law, does not in and of

itself defeat a Government obligation created by statute." *Prairie Cnty., Mont. v. United States*,

782 F.3d 685, 690 (Fed. Cir.), *cert. denied*, 136 S. Ct. 319 (2015).

62.     Attached to the HHS and CMS press statement was an October 12, 2017 order

from HHS Acting Secretary Eric Hargan to CMS Administrator Seema Verma, instructing that

"CSR payments to issuers must stop, effective immediately.  CSR payments are prohibited

unless and until a valid appropriation exists."  Letter from Eric Hargan, HHS Acting Secretary,

to Seema Verma, CMS Administrator (Oct. 12, 2017), attached hereto at <u>Exhibit 19</u>.

63.     Attached to Mr. Hargan's order was an October 11, 2017 legal opinion signed by

U.S. Attorney General Jeff Sessions and addressed to the Treasury Secretary and HHS Acting

Secretary.  *See* Letter from Jefferson B. Sessions III, U.S. Attorney General, to Steven Mnuchin,

Secretary of the Treasury & Don Wright, HHS Acting Secretary (Oct. 11, 2017), attached hereto

at <u>Exhibit 20</u>.

64.     Former U.S. Attorney General Sessions made two important admissions in his legal opinion.

65.     First, U.S. Attorney General Sessions admitted that Section 1402 "*requires* insurers offering policies through ACA exchanges to reduce co-payments and other out-of-pocket costs for certain policyholders (reductions referred to in the ACA as "Cost-Sharing Reductions")." *Id.* at 2 (citing ACA § 1402) (emphasis added).

66.     Second, U.S. Attorney General Sessions admitted that Section 1412 "*authorizes* the federal government to make payments directly to insurers to *offset* the lost revenue these [CSR] reductions cause." *Id.* (citing ACA § 1412(c)(3)) (emphasis added).

67.     As U.S. Attorney General Sessions stated in his official legal opinion of October 11, 2017, Section 1412 "authorizes" advance CSR payments from the Government to QHPs to "offset" the cost of QHPs' CSR discounts to eligible customers. *Id.* Section 1402 mandates that HHS "shall" make CSR payments to QHPs, and Congress never made those money-mandating obligations subject to the availability of appropriations or limited the Government's payment obligation in any way.  Therefore, the Government is liable to QHPs, like BCBSND, that suffered money damages as a result of the Government's unlawful refusal to make CSR payments while those QHPs remained statutorily obligated to provide mandatory CSR discounts to their eligible customers.

68.     The Administration's desire to violate the Government's statutory and contractual obligations and stop making advance CSR payments in order to harm QHPs had been expressed by President Trump both before and after the Government made its October 12, 2017 announcement through multiple Twitter postings.  *See* Exhibits 21 to 27 (relevant @realDonaldTrump tweets from April 26, 2017 to October 18, 2017).

69.     Pursuant to the Administration's decision, made with the specific intent by the Government to harm QHPs, HHS and Treasury has not made any of the Government's advance CSR payments to QHPs, like BCBSND, in and after October 2017.

70.     On October 13, 2017, CMS's Financial Management Coordination Center ("FMCC") emailed to BCBSND and other QHPs a letter stating that:

> [CMS] will discontinue payments of [CSR] to issuers effective in October. … For the October monthly payment cycle and beyond, CMS will withhold advance CSR payments for the current month of coverage and will not make any adjustments to CSR payment amounts related to retroactive enrollment data changes for prior months of 2017.  Issuers will therefore receive no net payment of 2017 advance CSR in the October and future payment cycles. … CSR reconciliation payments for the 2016 benefit year, including any payments owed as the result of reported discrepancies, will not be made.  CMS will collect CSR reconciliation charges that result from any discrepancies.

Email from CMS FMCC to BCBSND (Oct. 13, 2017, 3:55 PM), attached hereto at <u>Exhibit 28</u>.

71.     On October 20, 2017, CMS emailed to BCBSND and other QHPs a notice that "CMS has published a supplemental FAQ document today related to the cessation of cost-sharing reductions to provide additional detail on the impacts of this change to issuers' enrollment and payment data processing," and provided a link to the referenced FAQ document. Email from CMS FMCC to BCBSND (Oct. 20, 2017, 1:18 PM), attached hereto at <u>Exhibit 29</u>.

72.     CMS's FAQ document of October 20, 2017, confirmed that:

> For the October monthly payment cycle and beyond, CMS will not make advance CSR payments, and will not make any adjustments to CSR payment amounts related to retroactive enrollment data changes for prior months of 2017, unless Congress appropriates funding for these payments. Issuers will therefore receive no net payment of 2017 advance CSR in the October and future payment cycles.

Bulletin, CMS, *FAQ on Cessation of Payment of Cost-sharing Reductions* at 1 (Oct. 20, 2017), attached hereto at <u>Exhibit 30</u>.

73.    Regarding payments and charges from the CSR reconciliation process established

in the Government's implementing regulations, the FAQ document stated that:

> CSR reconciliation payments for the 2016 benefit year and prior year
> restatements previously scheduled for the October 2017 payment cycle or
> future cycles, including any payments calculated as the result of reported
> discrepancies, will not be made.  However, if a discrepancy results in an
> overpayment to the issuer, CMS will proceed with the collection of those
> charges after the issuer has been notified of CMS's discrepancy decision.

*Id.*

74.    Three federal judges have recognized the Government's liability to QHPs, like

BCBSND, in these particular circumstances regarding advance CSR payments.

75.    Judge Rosemary Collyer of the U.S. District Court for the District of Columbia

wrote that if CSR payments are discontinued, "[u]nreimbursed insurers might sue the

government under the Tucker Act, 28 U.S.C. § 1491(a)(1), to receive the money owed them

under ACA Section 1402(c)(3)(A) ('[T]he Secretary shall make periodic and timely payments to

the issuer equal to the value of the reductions.')."  *U.S. House of Representatives v. Burwell*, 185

F. Supp. 3d 165, 183 (D.D.C. 2016).

76.    Subsequently, Judge Vince Chhabria of the U.S. District Court for the Northern

District of California wrote that "the [ACA] requires the federal government to make advance

payments to the [health insurance] companies to cover the cost of this [CSR] subsidy"; that "the

[ACA] requires the insurance companies to be paid"; that "the [ACA] requires the federal

government to compensate the insurance companies for those [cost-sharing] reductions"; that the

ACA "required the federal government to pay the insurance companies in advance for these

[cost-sharing] reductions"; that the mandatory "shall" in Section 1402(c)(3)(A) "is how the

[ACA] 'authorized' the cost-sharing reduction program and the CSR payments to the insurers";

and that, "***In sum, the [ACA] requires the federal government to pay insurance companies to***

*cover the cost-sharing reductions.  **The federal government is failing to meet that obligation.**"*
*California v. Trump*, 267 F. Supp. 3d 1119, 1121-24, 1129, 1133 (N.D. Cal. 2017) (emphasis added).

77.     In two other CSR cases in this Court, Judge Kaplan recently granted summary judgment on liability in favor of the plaintiff insurers (and denied the Government's motions to dismiss), that asserted statutory CSR claims under Section 1402 virtually identical to those asserted here by BCBSND.  *See Montana Health Co-Op v. United States*, 139 Fed. Cl. 213, 214 (2018);  *Sanford Health Plan v. United States*, No. 18-136C, 2018 WL 4939418 (Fed. Cl. Oct. 11, 2018).

78.     BCBSND seeks monetary damages in this Court to compensate it for the Government's failure to make mandatory advance CSR payments to BCBSND on and after October 12, 2017.

## BCBSND's Advance Cost-Sharing Reduction Payments Owed Since October 12, 2017

79.     Between January 2014 and October 12, 2017, Defendant made monthly advance CSR payments to BCBSND on or about a date between the nineteenth and twenty-second of each month.  *See* Decl. of Elizabeth Parish in Supp. of Defs.' Opp'n to Pls.' Mot. for a TRO, *Calif. v. Trump*, No. 3:17-cv-5895-VC, ECF No. 35-3, at ¶ 5 (Oct. 20, 2017), attached hereto at Exhibit 31 (CMS official declaring under oath that "monthly [advance CSR] payments [are] scheduled for a pre-established date between the nineteenth and twenty-second of each month").

80.     The Administration announced its October 12, 2017 decision to stop making the Government's advance CSR payments before the Government made its expected October 20, 2017 monthly advance CSR payment to BCBSND.  *See id.* ("October payments are being made without CSR payments according to this schedule on October 20, 2017.").

81.     Defendant thus has made no advance CSR payments to BCBSND since September 2017.

82.     In the October 13, 2017 CMS FMCC email to BCBSND and other QHPs, CMS stated that it would continue to report the amount of monthly advance CSR payments a QHP would have received from the Government in and after October 2017, but that the same monthly payment report "will also show a lump-sum issuer-level manual adjustment that reverses the total net advance CSR payment," Email from CMS FMCC to BCBSND (Oct. 13, 2017, 3:55 PM), Ex. 28 resulting in no advance CSR payment being paid despite the Government's obligations to make such payments each month.

83.     CMS's FAQ document of October 20, 2017 also confirmed that "[QHPs] will see detailed advance CSR payments appear as in prior months on their payment reports[,] … [which] will also show a lump-sum issuer-level manual adjustment that reverses the total net advance CSR payment."  Bulletin, CMS, *FAQ on Cessation of Payment of Cost-sharing Reductions* at 1 (Oct. 20, 2017), Ex. 30.

84.     Consistent with CMS's October 13 and October 20, 2017 communications, each month since the Government's decision to breach its advance CSR payment obligation, CMS has reported to BCBSND the amount of advance CSR payments owed to BCBSND, but has reversed those payments with manual adjustments.

85.     As the Government stated in the October 2017 payment report it sent to BCBSND, BCBSND expected an advance CSR payment from Defendant of $ 460,019.84 in October 2017, which the Government refused to pay in violation of its obligations.

86.     As the Government stated in the November 2017 payment report it sent to BCBSND, BCBSND expected an advance CSR payment from Defendant of $ 452,023.12 in November 2017, which the Government refused to pay in violation of its obligations.

87.     As the Government stated in the December 2017 payment report it sent to BCBSND, BCBSND expected an advance CSR payment from Defendant of $444,842.62 in December 2017, which the Government refused to pay in violation of its obligations.

88.     BCBSND is also owed an additional $296,890.34 following the annual reconciliation of CSR payment amounts owed for CY 2017.

89.     In addition, BCBSND expected advance payments for each month in 2018 up to the date of this Complaint, all of which the Government has likewise refused to pay in violation of its obligations: $500,138.11 in January; $826,892.07 in February; $772,029.37 in March; $704,448.65 in April, $631,486.07 in May; $661,764.07 in June; $622,211.42 in July; $663,749.34 in August; $639,734.38 in September; $638,374.89 in October; $632,491.84 in November; and $626,363.98 in December.

90.     BCBSND demands full and immediate payment from the United States in the total amount of $9,573,460.11 for advance CSR payments due and owing to BCBSND as of this Complaint's filing date, which Defendant has refused to pay in violation of its obligations.

## COUNT I
### Violation of Federal Statute and Regulation

91.     Plaintiff realleges and incorporates by reference all of the allegations contained in the preceding paragraphs as if fully set forth herein.

92.     Section 1402(c)(3)(A) of the ACA mandates compensation, expressly stating that "the [HHS] Secretary shall make periodic and timely payments to [QHPs] equal to the value of the [CSR discounts]" that QHPs provide to eligible customers.  42 U.S.C. § 18071(c)(3)(A).

93.     Section 1412(c)(3) of the ACA likewise mandates compensation, expressly stating that the "Treasury [Secretary] shall make such advance [CSR] payment [to QHPs] at such time and in such amount as the [HHS] Secretary specifies."  42 U.S.C. § 18082(c)(3).

94.     HHS's and CMS's implementing regulation at 45 C.F.R. § 156.430(a) also mandates compensation, expressly stating that "A QHP issuer will receive periodic advance [CSR] payments."  45 C.F.R. § 156.430(a).

95.     Furthermore, HHS's and CMS's implementing regulation at 45 C.F.R. § 156.430(e)(1) mandates compensation, expressly stating that "If the actual amounts of cost-sharing reductions [provided by QHPs to enrollees] are – (1) More than the amount of advance payments provided [by HHS and Treasury to a QHP] and the QHP issuer has timely provided the actual amounts of cost-sharing reductions as required …, HHS will reimburse the QHP issuer for the difference."  45 C.F.R. § 156.430(e)(1).

96.     HHS and CMS have long recognized "the [HHS] Secretary's *obligation* to make 'periodic and timely payments equal to the value of the [QHPs' CSR] reductions' under section 1402(c)(3) of the Affordable Care Act."  78 FR 15409, 15486 (Mar. 11, 2013) (Final Rule) (emphasis added).

97.     BCBSND is entitled under Section 1402(c)(3)(A) of the ACA, Section 1412(c)(3) of the ACA, and 45 C.F.R. § 156.430(a) and (e)(1) to receive monthly advance CSR payments from Defendant in an amount equal to the full amount of the monthly CSR discounts that BCBSND provides to its eligible customers for essential health benefits.

98.     BCBSND has provided CSR discounts to its eligible customers for essential health benefits every month since January 2014.

99.     Every month between January 2014 and September 2017, Defendant complied with its obligations and made mandatory monthly advance CSR payments to BCBSND.  *See* 42 U.S.C. § 18071(a).

100.    BCBSND has not received any monthly advance CSR payments from Defendant since October 2017, as a result of the Government's unlawful decision on October 12, 2017 to breach its statutory and regulatory obligations and stop making monthly advance CSR payments to BCBSND and other QHPs.

101.    Despite the Government's unlawful decision, the Government has continued to acknowledge the amount of advance CSR payments it owes to BCBSND each month, in monthly payment reports sent to BCBSND starting in October 2017.

102.    Congress did not repeal, amend or otherwise abrogate the statutory obligation created by Sections 1402 and 1412 to make full and timely advance CSR payments to QHPs, including BCBSND, that provide CSR discounts to their eligible customers for essential health benefits.

103.    The Government's failure to make full and timely advance CSR payments to BCBSND since October 12, 2017 constitutes a violation and breach of the Government's mandatory payment obligations under Sections 1402(c)(3)(A) and 1412(c)(3) of the ACA and 45 C.F.R. § 156.430(a) and (e)(1).

104.    As a result of the United States' violation of Sections 1402(c)(3)(A) and 1412(c)(3) of the ACA and 45 C.F.R. § 156.430(a) and (e)(1), BCBSND has been damaged in

the amount of at least $9,573,460.11 on this Complaint's filing date, together with interest, costs of suit, and such other relief as this Court deems just and proper.

<u>COUNT II</u>
**Breach of Implied-In-Fact Contract**

105.    Plaintiff realleges and incorporates by reference all of the allegations contained in the preceding paragraphs as if fully set forth herein.

106.    The Government knowingly and voluntarily entered into valid implied-in-fact contracts with BCBSND regarding the Government's obligation to make full and timely advance CSR payments to BCBSND in exchange for Plaintiff's voluntary agreement to participate as a QHP in the North Dakota ACA Exchange and undertake the obligations of a QHP including, among other things, providing CSR discounts to BCBSND's eligible customers.

107.    The existence of an implied-in-fact contract can be inferred from both the promissory "shall pay" and "will pay" language in Sections 1402 and 1412 of the ACA and their implementing regulations (45 C.F.R. § 156.430), as well as from the parties' conduct and the totality of the circumstances surrounding the enactment and implementation of the ACA and the CSR program, by which Congress, HHS, CMS, and Treasury committed to fully reimburse QHPs in advance for the CSR discounts that QHPs were obligated to provide to their eligible customers.

108.    Sections 1402 and 1412 of the ACA and their implementing regulations (45 C.F.R. § 156.430), confirmed and ratified by HHS's and CMS's repeated assurances admitting their obligation to make full monthly advance CSR payments, constituted a clear and unambiguous offer by the Government to make full and timely advance CSR payments to health insurers, including BCBSND, that agreed to participate as QHPs in the ACA Exchanges and

were approved as certified QHPs by the Government at the Government's discretion.  This offer evidences a clear intent by the Government to contract with BCBSND.

109.    The Government provided in Sections 1402 and 1412 of the ACA a program that offered full reimbursement in advance of BCBSND's actual costs in providing CSR discounts to its eligible customers in return for BCBSND's voluntary performance in the form of an actual undertaking and gave HHS no discretion to decide whether or not to pay eligible QHPs that agreed to participate the specific amount of CSR discounts that they provide to eligible customers.

110.    BCBSND accepted the Government's offer by developing QHPs that complied with the ACA's requirements, agreeing to become a QHP and perform as a QHP on the ACA Exchange in North Dakota, and providing CSR discounts to BCBSND's eligible customers.

111.    By agreeing to become a QHP, BCBSND agreed to provide services by offering health insurance on particular Exchanges established under the ACA, and to accept the new obligations, responsibilities and conditions the Government imposed on QHPs – subject to the implied covenant of good faith and fair dealing – under the ACA and its implementing regulations.

112.    As agreed under the implied-in-fact contracts between BCBSND and Defendant, Plaintiff provided a service to Defendant by delivering the Government's federal CSR subsidies to BCBSND's eligible customers, on the promise that Defendant would provide advance reimbursements of Plaintiff's actual costs in the form of monthly advance CSR payments.

113.    BCBSND was not obligated to participate as a QHP, to incur Exchange-related costs and losses, and to provide healthcare benefits – including mandatory CSR discounts – to numerous enrollees at premiums that were lower than they would have been without the

Government's promised full advance reimbursement of the CSR discounts that BCBSND provided to its eligible customers.

114.    The Government's agreement to make full and timely advance CSR payments was a significant factor material to BCBSND's agreement to become a QHP and participate in the North Dakota ACA Exchange.

115.    BCBSND, in turn, provided a real benefit to the Government by agreeing to become a QHP in North Dakota, and to offer affordable health insurance on and to participate in the ACA Exchange.  Without sufficient health insurers voluntarily agreeing to participate in the new ACA Exchanges, and providing CSR discounts to eligible enrollees, the ACA could not have been implemented as intended.

116.    Without BCBSND's agreement to provide CSR discounts to eligible members, in exchange for the Government's promise to make required advance CSR monthly payments to BCBSND, the members eligible to receive such CSR discounts in the form of reduced out-of-pocket costs, deductibles and copays, may not have been able to participate in or obtain health insurance coverage on North Dakota's ACA Exchange.

117.    BCBSND satisfied and complied with its obligations and/or conditions which existed under the implied-in fact contracts.

118.    The parties' mutual intent to contract is further confirmed by the parties' conduct, performance and statements, including, but not limited to, the Government's repeated actual monthly payment of advance CSR payments to BCBSND for the 45 consecutive months from January 2014 through September 2017.

119.    As former U.S. Attorney General Sessions acknowledged, Section 1412 "***authorizes*** the federal government to make payments directly to insurers to offset the lost

revenue these [CSR] reductions cause."  Letter from Jefferson B. Sessions III, U.S. Attorney General, to Steven Mnuchin, Secretary of the Treasury & Don Wright, HHS Acting Secretary (Oct. 11, 2017) (citing ACA § 1412(c)(3)) (emphasis added), <u>Ex. 20</u>.  The Secretaries of the Treasury and HHS were therefore authorized by law under the ACA to make the Government's advance CSR payments to BCBSND.

120.    Defendant's implied-in-fact contracts with BCBSND were furthermore authorized and/or ratified by representatives of the Government who had express or implied actual authority to bind the United States, were clearly founded upon a meeting of the minds between the parties and entered into with mutual assent, and were supported by consideration.

121.    BCBSND has not received any monthly advance CSR payments from Defendant since October 2017 as a result of the Government's unlawful decision on October 12, 2017, to breach its obligations under the implied-in-fact contracts and stop making monthly advance CSR payments to BCBSND and other QHPs.

122.    Despite the Government's unlawful decision, the Government has continued to acknowledge the amount of advance CSR payments it owes to BCBSND each month, in monthly payment reports sent to BCBSND starting in October 2017.

123.    Congress did not repeal, amend or otherwise abrogate the obligation established in Sections 1402 and 1412 to make full and timely advance CSR payments to QHPs, including BCBSND, that provide CSR discounts to their eligible customers for essential health benefits.

124.    The Government's failure to make full and timely advance CSR payments to BCBSND on and after October 12, 2017, as the Government was obligated to do, is a continuing material breach of the implied-in-fact contracts.

125.   As a result of the United States' material breaches of its implied-in-fact contracts

that it entered into with BCBSND regarding advance CSR payments, BCBSND has been

damaged in the amount of at least $9,573,460.11 on this Complaint's filing date, together with

any losses actually sustained as a result of the Government's breach, reliance damages, interest,

costs of suit, and such other relief as this Court deems just and proper.

### COUNT III
**Taking Without Just Compensation**
**in Violation of the Fifth Amendment to the U.S. Constitution**

126.   Plaintiff realleges and incorporates by reference all of the allegations contained in

the preceding paragraphs as if fully set forth herein.

127.   The Government's actions complained of herein constitute a deprivation and

taking of BCBSND's property for public use without just compensation, in violation of the Fifth

Amendment to the U.S. Constitution.

128.   BCBSND has vested property interests in its contractual, statutory, and regulatory

rights to receive mandatory advance CSR payments from Defendant.  BCBSND had a reasonable

investment-backed expectation of receiving the full and timely advance CSR payments payable

to it under the statutory and regulatory formula, based on its implied-in-fact contracts with the

Government, Sections 1402 and 1412 of the ACA, HHS's implementing regulations (45 C.F.R. §

156.430), and HHS's and CMS's direct public statements and conduct.

129.   The Government has expressly and deliberately interfered with and deprived

BCBSND of Plaintiff's property interests and its reasonable investment-backed expectations to

receive full and timely advance CSR payments since October 12, 2017, when HHS announced,

in direct contravention of Sections 1402 and 1412 of the ACA, 45 C.F.R. § 156.430, its previous

public statements, its contracts with BCBSND, and its course of dealing and course of

performance for the previous 45 months, that it would stop making advance CSR payments to

QHPs.

130.     This announcement was preceded and followed by the President of the United

States' statements on Twitter deriding the advance CSR payments that QHPs had been receiving

as reimbursement for the CSR discounts that QHPs were providing to their eligible customers,

pursuant to the Government's and QHPs' obligations, and expressing the Government's intent to

"***hurt the insurance companies***" by refusing to make advance CSR payments.  Donald J. Trump

(@realDonaldTrump), Twitter (July 31, 2017, 5:16 AM),

https://twitter.com/realdonaldtrump/status/891996053611917312 (emphasis added), Ex. 23; *see*

*also* Exs. 21-22 & 24-27 (additional relevant Twitter statements by President Trump from April

26, 2017 to October 18, 2017).

131.     The Government considers Twitter statements by the President of the United

States to be "official statements" of the United States.  *See, e.g.*, Elizabeth Landers, *White*

*House: Trump's tweets are 'official statements,'* CNN, June 6, 2017, attached hereto at Exhibit

32 ("The President is the President of the United States, so they're considered official statements

by the President of the United States.").

132.     The Government's official policy as stated by the President's tweets specifically

targeted the Government's existing, mandatory advance CSR payment obligations as established

in Sections 1402 and 1412 of the ACA and unlawfully halted the United States' advance CSR

payment obligations owed to a specific small group of insurers, including BCBSND, with the

express intent to "***hurt the insurance companies***."  HHS, CMS and Treasury continue to refuse

to make the Government's full and timely advance CSR payments, causing money damages to

BCBSND and other QHPs, and therefore the Government has deprived BCBSND of the economic benefit and use of such payments.

133.    Despite the Government's unlawful decision, the Government has continued to acknowledge the amount of advance CSR payments it owes to BCBSND each month, in monthly payment reports sent to BCBSND starting in October 2017.

134.    The Government's action in withholding, with no legitimate governmental purpose, the full and timely advance CSR payments owed to BCBSND since October 2017 constitutes a deprivation and taking of Plaintiff's property interests and requires payment to BCBSND of just compensation under the Fifth Amendment of the U.S. Constitution.

135.    BCBSND is entitled to receive just compensation for the United States' taking of its property in the amount of at least $9,573,460.11 on this Complaint's filing date, together with interest, costs of suit, and such other relief as this Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against the Defendant, the United States of America, as follows:

(1)    For Count I, awarding damages sustained by Plaintiff, in the amount of at least $9,573,460.11, subject to proof at trial, as a result of the Defendant's violation of Sections 1402 and 1412 of the ACA and of 45 C.F.R. § 156.430 regarding the advance CSR payments owed to Plaintiff from October 12, 2017, through the date of entry of judgment against the United States;

(2)    For Count II, awarding damages sustained by Plaintiff, in the amount of at least $9,573,460.11, subject to proof at trial, together with any losses actually sustained as a result of the Government's breach, and reliance damages, as a result of the Defendant's breaches of its

implied-in-fact contracts with Plaintiff regarding the advance CSR payments owed to Plaintiff from October 12, 2017 to this Complaint's filing date;

(3)     For Count III, awarding damages sustained by Plaintiff, in the amount of at least $9,573,460.11, subject to proof at trial, as a result of the Defendant's taking of the Plaintiff's property without just compensation in violation of the Fifth Amendment to the U.S. Constitution regarding the advance CSR payments owed to Plaintiff from October 12, 2017 to this Complaint's filing date;

(4)     Awarding all available interest, including, but not limited to, post-judgment interest, to Plaintiff;

(5)     Awarding all available attorneys' fees and costs to Plaintiff; and

(6)     Awarding such other and further relief to Plaintiff as the Court deems just and equitable.

Dated: December 27, 2018              Respectfully Submitted,

*Of Counsel:*                    s/ Lawrence S. Sher
                                Lawrence S. Sher (D.C. Bar No. 430469)
                                **REED SMITH LLP**

Conor M. Shaffer (PA Bar No. 314474)    1301 K Street NW
**REED SMITH LLP**                    Suite 1000-East Tower
Reed Smith Centre                     Washington, DC 20005
225 Fifth Avenue, Suite 1200         Telephone: 202.414.9200
Pittsburgh, PA 15222                 Facsimile: 202.414.9299
Telephone: 412.288.3131             Email: lsher@reedsmith.com
Facsimile: 412.288.3063
Email: cshaffer@reedsmith.com        *Counsel for Noridian Mutual Insurance*
                                  *Company d/b/a Blue Cross Blue Shield of*
                                  *North Dakota*

## CERTIFICATE OF SERVICE

I hereby certify that on December 27, 2018, a copy of the foregoing Complaint and accompanying Exhibits were filed electronically with the Court's Electronic Case Filing (ECF) system. I understand that notice of this filing with be sent to all parties by operation of the Court's ECF system.

s/ Lawrence S. Sher
Lawrence S. Sher
*Counsel for Plaintiff*